Our three judges up here. Judge Joe Flatt is joining us by phone. He will be asking any questions if he has any, and will be participating in the conference with us as a full member of the panel. That said, we'll start with U.S. v. Mayweather. Ms. Salas. Yes, Judge. Good morning, and may it please the Court. My name is Natasha Purdue-Salas, and I represent former Correctional Officer Christopher Williams. There are two issues that I want to present to the Court. One relates to the defense of entrapment and the Court's failure to give the instruction, and the other one relates to McDonnell v. United States. I think that the key to deciding this case in terms of entrapment is this Court's interpretation of the word persuasion. In this case, the government hired a paid informant and then authorized him to make an obscenely high offer to prison guards that it wanted to lure into its sting operation. The government was somewhat overzealous and authorized the informant to make an offer of approximately one month's salary in exchange for about one hour's trouble. When you say obscenely high, and in your briefing you mentioned this, the one month's salary, the way you phrase that by tying it to the person's salary, are we necessarily looking at not the dollar amount, but then the financial circumstances of the defendant, according to your argument, even though the government isn't responsible for the financial circumstances of the defendant? Well, the key is, again, in the word persuasion. And for someone who is making $20,000 a year, which the government well knew when they attempted to lure these officers into their operation, the equivalent of one month's salary is very persuasive in terms of getting someone to participate. But it's not only the financial reward. Counsel, where's the line? What's the ratio between his monthly salary and the amount of time he has to spend? Do we work out what his hourly rate is and then say, well, if he's just riding in the car for an hour, that's an obscene amount of money for that? I don't understand that. The court has, in the past, talked about the fact that there could be a point at which the dollar amount is too high, but the court has never drawn a line. We're here asking the court not to find that this is entrapment as a matter of law, but to submit the matter to a jury. Based in part on the amount of money per hour, I guess, his hourly rate, is that what you're saying? Monthly salary was about $1,000, and each time these guards... No, but you said for one hour's work. I did. So, $1,000 for an hour is too much. What about $100 for an hour? Judge, it depends on the person, and these particular people were making about $20,000 a year. So, I would think that there'd be plenty of law firm partners to whom $1,000 wouldn't be very persuasive. Tell me where the cutoff is for these people. It's not a cutoff that the court needs to make. It's a cutoff that the jury needs to make. So, every case is an entrapment case for the jury? No, every case is not an entrapment case. The government offers somebody a dollar to do it. According to you, it's for the jury. No, Judge, that's not my position. All right, tell me where, for these defendants, it became a jury question. At what hourly rate? Well, if we were relying only on the dollar amount, then I would understand. But in this case, we're not relying only on the dollar. As you do, in part, on the dollar amount, where, in part, does it become a jury question based on the dollar amount? Based on the dollar amount, Judge, it becomes a jury question when the circumstances of the dollar amount make it so high that it would tempt the average person. I'm sorry, Counselor, you've got to help me. I'm the district judge. I'm trying to decide whether to give the instruction or not. I know that these defendants make $20,000 a year. You've told me that. Yes, Judge. All right. At what hourly rate does it become a factor that makes it a jury question? I will not have an hourly rate to pose to you. That was not my argument below. What am I, as a district judge, supposed to do with your argument? You won't give me an hourly rate, so whenever there's money involved, it goes to the jury? Well, again, that's not actually my argument, Judge. My argument is that the dollar amount that was offered, coupled with the fact that the informant offered the equivalent of a blank check to these officers, coupled with the fact that he gave them a litany of persuasive points and persuaded them to be involved in this, those are the things that we relied upon to ask the judge to give the jury instruction. When you say blank check, you're talking about the one comment that was made where, take care of my people, is that what you're referring to? It's more than one comment, Judge. That is how he put it at the beginning of the meeting. But towards the end of the meeting, he also mentioned that if there was anything they needed, if they got a traffic ticket or anything, just call him and he will wire the money. He put no upper limit on what he was offering. And then when my client called him in November of 2014 to let him know that he wanted to follow up on that offer of a blank check, he told him that the key to that was recruitment of more officers. So we know that Mr. Williams did focus on this offer of a blank check. And this court has never held that an unlimited amount of remuneration is not persuasive. This court has not talked about particular dollar amounts either, Judge, as the court has already noted. The government, I know, is going to make two arguments, and one of them concerns derivative entrapment. I want to make it clear that my position is that Christopher Williams is not a derivative entrapment defendant. And in particular, this court's jurisprudence in Brown and in Walker shows that when someone else introduces another person into the wrongdoing, that is not the point at which you determine who's making the persuasion. The key point is who persuaded the person to be involved in the wrongdoing. In both Walker and Brown, someone else introduced the person, but that person still got the entrapment instruction based upon their contacts with the government informant. Another argument that I expect the government to make is that Mr. Williams participated in this on a number of occasions, and I wanted to let the court know that in the Supreme Court case of Sherman v. United States, that case, too, was a case where there was a series of transactions, but that did not bar the defendant from raising the entrapment defense. I would think your best argument is that Williams didn't join until after he heard the pitch from Woodward. And that is my argument, Judge. So if the co-conspirators had talked him into it and he had joined before he ever encountered the agent, your argument is, maybe that's mirrors, maybe not, but it doesn't affect my guy because he didn't join until he heard the agent pitch. That's exactly right, Judge, and that is the way that the facts played out. I don't want to neglect to get to my other argument, which I also present to you as reversible error, and that concerns McDonald v. United States. The defendants requested, and this relates to the Hobbs Act counts, we requested this court's updated pattern charge following McDonald v. United States, but the district court refused to give the charge and, in fact, gave absolutely no definition of official act. But the district court refused to give it because they said that it didn't fit the facts of this case, correct?  Okay, and in the McDonald case, the parties had actually agreed that they would define official act by looking to the bribery statute, but we don't have that here. That is correct, Judge, but in McDonald, the Supreme Court said that if there wasn't a properly cabined definition of official act, then there were constitutional problems with vagueness. But, of course, if you look at what actually happened in this case, the government got up and argued that putting on a uniform was an official act, and the defendants got up and argued that putting on a uniform was not an official act, and the jury had absolutely no guideposts by which to evaluate whether the government was right or whether the defense was right. But what about the fact that the McDonald case, which involves a governor and the duties of governor, the district court said that this doesn't bear a resemblance to this situation. So if the jury charge, if the facts of that case don't fit this case, why would the district court judge give that charge? I'm glad you asked that question. I see my time is running down. It's an important question, and so the answer is this. There's no reason to think that the McDonald case is inapplicable to a prison guard. In McDonald, the person who was bribing the governor was essentially paying him for association with his product in hopes that the governor's association with the product, may I complete my answer? Sure. In hopes that the governor's association would turn into benefits and they would make more money. In this case, the way the sting was set up, the informant was paying the officers to wear uniforms so that when they were stopped, a police officer would see their association with him and hopefully not get searched. But just like in McDonald, that was not an official act, here too that was not an official act. Okay, counsel, you've got two minutes reply. We'll hear now from Mr. O'Brien. Mr. O'Brien, Mr. Smith, Mr. Hart, I see you've reserved a minute each for reply. My experience has shown me over the past quarter of a century that lawyers do that because they think once I get started, the judge won't stop me. I promise you I will stop you. If you want to use that minute here, you can do so. If you want to try to get out two or three sentences in reply, you're welcome to do that. Okay. Well, let me just run through it and see how it goes. May it please the court, I'm Dennis O'Brien. I represent Jeremy Fuelman. There's a principle that holds that if the reason for the rule doesn't apply, then the rule shouldn't apply. And that's the rationale in his nod. The basis for his nod was that his nod didn't have any direct contact with the agents, consequently he shouldn't have had the benefit of the entrapment charge. And that was the reason for it. Of course, the converse to that rule also applies. If the reason for the rule does apply, then the rule should apply. And that is the case with Mr. Fuellman. There's a couple of things I think that are important concerning Mr. Fuellman that sort of were raised here a few minutes ago when you asked some questions. Initially, Mr. Fuellman is at the headwaters of this particular activity. Some of these people are downstream entries to this thing, but he's not. He's right at the beginning. In fact, he was contacted directly by Mr. Woodard, the government's agent. A little background on it was that Fuellman and Ms. Brooks worked together, and Ms. Brooks initially became involved with Mr. Woodard. And she mentioned to Mr. Fuellman that, hey, I'm making some money. Here's a chance to make some money. I think she gave Mr. Fuellman Mr. Woodard's phone number, but he didn't call him. In fact, the testimony is one day she came to me and said that she had met a guy, real cool. He just liked to help people out. You know, I know you need some money. You should talk to him. I thought about it. I was like, I don't know. She eventually gave me his number, but I still did not contact him. As a result of your conversation with Ms. Brooks and what you just told us, what did you do, if anything? He called me shortly after, and I said, Mr. Woodard, and he said yes. Turned out to be Mr. Woodard, yes. He called you? Yes. He basically told me, hey, I do transport. You just have to ride with me 20 or 30 minutes. You'll be in and out of there. Did he suggest, this is significant here, did he suggest anything to you that he knew you had some outstanding bills? Answer, on the telephone calls, but they're not here. I haven't heard them. He knew about my DUI. He would ask how was it going. He told me if I did the run, I'd have enough money to pay for the DUI and I wouldn't get probation. I could keep my job. Now, you asked about the incentive to Ms. Silas here and how much, what's the bright line here. What happened in this case, it's not so much about money. It was about job. The background is this, that Mr. Whelan had a DUI, and there were expenses that were attended to the DUI. And if he had to pay the expenses, he had a choice of paying them up front or he could go on probation and pay them. If he went on probation, Your Honor, he would have lost his job. You cannot be on probation and be a prison guard. So, consequently, his concern was keeping his job. And this was the inducement that was offered to Mr. Whelan. If you take the bait, you'll be able to keep your job. Now, certainly there's an economic component to keeping your job, but there's a lot of other reasons why people keep their job. Maybe he liked his job. Maybe he didn't want to get fired from his job because it would make it more difficult to get another job. But the point is the inducement that Mr. Woodard offered to Mr. Whelan at the conceptual stages of this entire incident was that if you took this bait, you could keep your job. So under your argument to say that this is not a derivative entrapment case. No, absolutely not with Mr. Whelan. But so under your argument, if the government agent in any way offers anything, whether it's money, whether it's anything to help with the DUI and any kind of job issues, if the government agent offers anything as an inducement, that would entitle your client to an entrapment defense. I don't think that's necessarily the law, and I don't think that's factually accurate. I think the law says— But how do you get around the derivative entrapment problem where Brooks has brought your client into this? I disagree. She didn't bring him into this, ma'am. If you read the transcript, you will see that she told him about this guy. And then he said he hesitated. He did not call this fellow. This fellow called him. He had direct contact. After he said what? After who said what, Judge? After your client said what to the, quote, co-conspirator, end of quote. Well, I'll just read what the testimony was. One day she came to me and said she met a guy, real cool. He just liked to help people out. You know, I need—and she said to him, I know you need some money. You should talk to him. I thought about it. I was like, I don't know. She eventually gave me his number, but I still did not contact him. And then Mr. Woodard called him, because Ms. Brooks had also given Mr. Woodard Flewellen's number, and he's the one that reached out to Flewellen. That's the difference between Mr. Flewellen and some of the downstream people, and that is the distinction between Isnodden and Mr. Flewellen's case. See, I guess I'm out of time here. But, well, anyway, that is the main thing with Mr. Flewellen, Your Honor. And respectfully, Mr. Flewellen, you know, the law says any evidence of inducement, and the law says things like it's a real light burden, and the law says it's things like these are jury questions. So respectfully, I think that Mr. Flewellen should have been— As you noted, you are out of time. Thank you, Judge. All right. Mr. Smith. Good morning. May it please the Court. Vernon Smith, and I represent Chelsea Mayweather. And I, too, am going to talk about entrapment this morning with Chelsea. Before we do that, let me ask you, why did you not adopt their argument on the McDonald issue? Your Honor, I thought about adopting the argument on the McDonald issue, I believe, in my particular case based on the sentencing that it was not appropriate for my client. I don't understand. Based on the sentencing? I thought that the sentencing, should we prevail on the entrapment issue, which I believe is the main issue for my client, then that would also encompass the McDonald issue. If we were not able to prevail on that issue, then I thought that the sentencing would essentially be—it would not increase the sentencing. I certainly think that that may have been a mistake on my part. You had nothing to gain. I don't believe I had anything to gain. What did you have to lose? Well, and I suppose I probably should have adopted that argument, Your Honor. Okay. Go ahead with your other argument. Certainly, Your Honor. And in this particular case, we are dealing with a situation where there were two instances of inducement for Ms. Mayweather. The first one was when she was contacted by a co-defendant in the case. And what's interesting about this in that, in general terms, derivative entrapment is when a private person brings someone into a conspiracy. But in this case, I think it can be argued, and I think that we have not seen this before, or at least not seen in the cases in the Eleventh Circuit cases, that the co-defendant acted as an agent or at least a sub-agent of the government. The reason that happened is they were paid. They were given a commission to bring people in. This is not a situation where the co-defendants were told, Bring your friends in. They can all enjoy the benefits of this. This was a situation where they were told, You bring your friends in. We will give you extra money. We're going to pay you to bring people in. That takes away any of the reasoning behind not having derivative entrapment. For instance, with derivative entrapment, you have the thought that, Well, these people are not being paid. They're not an agent of the government, so they don't have to have the control. In this situation, they are being paid. They are given commissions. They would have to have that control. They would have to have some sort of control about what was going to be told to the defendants. And I think that based on that, the derivative entrapment doesn't necessarily apply to Ms. Mayweather's case. The facts were that she was called multiple times, that she didn't want to do it at first, that she continued to be called until she finally moved and joined the and went in to listen to what Mr. Woodard had to say. And Mr. Williams, the person that did that, got paid for that. And I believe he got paid a significant amount. I think the record shows that it was somewhere between $1,000 and $1,500 just for bringing in other people. But you don't have to just go with what might be seen as, I guess, a de facto agent, because she also went to the scene. And when she went to the scene, she was induced by Agent Woodard. In fact, I think the record showed that she didn't at first want to even look inside the bag. She was afraid to do that. She indicated that that was more money than she'd ever seen in her life. And so we get back to the money issue, Your Honor. And I think that in this particular issue, it is a lot of money. And I think that it may be appropriate to, because what you can't do, and I think that, let's say you set a dollar amount, you set an hourly amount. Well, that's going to change every year. I mean, things change. The economies change. What's good for one year is not good for another. We'll put an inflation adjustment on it, Counsel. I'm sorry, Your Honor? We'll put an inflation adjustment on it. I'm being facetious to show how silly your point is that the amount of money is critical because you can't pick an amount of money in a given case. We need to give instructions to the district court judges about these matters. And if we say the amount of money matters, we've got to have some kind of general description about what we're talking about. I would submit to this Court, Your Honor, that if the amount of money matters, then it doesn't necessarily mean you have to set a number. I think that if you can show, because you have to show two things. You have to show inducement and you have to show predisposition. And if you can show that they're not predisposed to the crime and that there is an inducement of money no matter how small the amount, then it does become a jury question. I'll give you $10 if you'll do this. If I wasn't predisposed to the crime, then I think that that is a question that the jury would look at, and they would determine because otherwise you don't have to worry about a set number. So any dollar amount, regardless of the economic circumstances of the person being solicited to join, any dollar amount sends it to the jury. But it still has to meet both prongs of getting it to the jury. You have to show that they were not predisposed to commit a crime before. Well, the very fact of offering them money sort of suggests perhaps, goes to your point, that maybe they weren't predisposed, so I've offered them $10 even though it's a law firm partner. Does that go to a jury? I don't see why it would not go to a jury. And it might sound like it's ludicrous that somebody was offered $10 and it would go to a jury, but the jury would, I mean, who knows, the jury may look at that and say, we're absolutely rejecting that. That's a ridiculous amount of money, and we don't think that's nearly enough to get entrapment. On the other hand, they might look at all aspects of the case and say, in this particular case, based on the dollar amount and their circumstances, that we do feel that that's a normal amount. I don't see why that would not be any other defense. Thank you, Mr. Smith. Mr. Hart. May it please the Court, I represent Tremaine Tucker, former corrections officer, and I also am going to talk about entrapment. It is our position, Judge, that Mr. Tucker was not derivatively entrapped. I think you can look at the circumstances surrounding his two— How much did Williams tell Tucker before Woodward spoke with Tucker? Williams told Tucker, as far as the record, that he had a guy he could meet that could help him make some money. He did not discuss with him exactly what that would be. The first time that drugs were mentioned was at the initial transaction. The first time that my client met the agent was the first time that drugs were mentioned. In fact, during cross-examination and trial, the agent admitted that we need to explain this to Tucker, which is what he called him. So the first time that drugs were mentioned was on April 22, 2015, when Mr. Tucker first met Mr. Woodward. I thought Tucker was the one who explained the operation. I'm sorry. I thought Woodward was the one that explained the operation. It wasn't Williams, right? Right. Two Tucker. Yeah, two Tucker at that first meeting. And so that was—before that, Mr. Woodward had contacted Mr. Tucker. He had always initiated contact. Mr. Tucker never initiated contact to him on several occasions. And when he proposed the first meeting date, Mr. Tucker, in fact, told him that he was not available during that time. So there had been at least one prior attempt to set up that initial meeting date. So it's our contention that while Williams initially mentioned to Mr. Tucker that he needed to talk to and meet Mr. Woodward, that Mr. Woodward's repeated contacts to him and the fact that the first time that it came up was at that initial meet, that drugs were, in fact, involved, and it came up, Judge, in conjunction with a veiled threat as to what could happen to someone when involved in this transaction that could be coined as at least mildly coercive at that initial transaction. Tell me what that was again. Specifically, Judge, during cross-examination or direct examination, Mr. Woodward said, now you are saying, well, counsel for the government said, now you are saying, look, it's going to be cocaine. There will be a black one. It is going to be, if I tell you it's going to be cocaine, there will be a red one. Don't get it. And Woodward, the agent, said, don't touch it. And then the government's attorney said, don't touch it because it's going to be on your head and it's going to be on my head. And Woodward said, yes, sir. And the government's attorney said, what are some of those consequences? And Woodward said, you can get hurt, you can get beaten, or you can lose your life. And this all culminated at the first transaction. So this is the first time. Yeah, but he said, don't touch it. He didn't say, don't back out of the deal. Don't go honest on me. No, he didn't say that, Judge. He said, don't touch the illegal drugs, which is a crime to possess or transport. Correct, Judge. But he said that in conjunction with the first time Mr. Tucker was hearing about drugs. And he didn't give him the opportunity to withdraw from the transaction. Later on in that initial transaction, he did say, if you, some to the effect of, if you guys don't want to be involved, you can get out of it. But that was already after he said this language. It sounds to me like, and that's why I asked the question initially, that that was an implied threat, not get involved. Not to, don't stay uninvolved. Well, Judge, that's exactly why I think it could be a question in terms of the light burden of production that a defendant would have in this situation for the jury to consider. Because under those same circumstances, someone in Tucker's position, after hearing for the first time that drugs were involved, and after hearing a threat as to how dangerous they were, could feel like if he withdrew at that moment, he could be in danger. And that could be a jury question for them to consider under the circumstances. Okay. And Judge, I think under these circumstances, for some of the reasons that my co-counsel has already pointed out, he was not predisposed to committing these charges, and he was not, and he was induced into meeting them. Because I do want to also point out to the court, the special, Mr. Williams and Mr. Tucker, and the government was aware of this, knew each other prior to these incidents coming up, and lived close to one another prior to these incidents coming up. And I think that was taken advantage of as well. Okay. Mr. Hart, appreciate it. We'll hear now from Mr. Gose. Good morning, Your Honors. My name is John Gose. I represent the United States on this appeal. I also represented the United States at the trial. The first point I'd like to start with is Ms. Silas' statement at the outset of the oral argument that the word to focus on here is persuasion as to the entrapment defense. And I would assert, Your Honors, that the word to focus on before assessing persuasion is the word initiator. Initiator is the exact terminology used in the Isnedin case from 2014, which we've relied on regarding the derivative entrapment issue. And the Isnedin court made it clear that where the initiator is not a government agent, whether that's an undercover officer or a source working for the government, where the initiator is an unwitting participant, there cannot be entrapment. And that makes sense because the purposes of entrapment is to kind of discourage and prevent improper government conduct. And where the initiator of the criminal activity is not a government agent, then entrapment necessarily should not apply. How much does the initiator have to do as the initiator? Is it enough to introduce two people? Does the initiator actually have to persuade the person to join the conspiracy? What does the initiator have to do? Because you've got the other side who's arguing, yes, they may have made introductions, but Woodard is the one who persuaded everybody to join, and Woodard is the government agent. I have two answers to that question, Your Honor. First, as to the second part, I think that Mr. Woodard did not persuade any of the defendants. He just explained the logistics as to what was going to happen. And as far as the definition of initiator, the Isnedin court doesn't spell it out, but I think the facts from Isnedin give a good example of what initiation counts, what initiation is. And so it's worth taking a look at the Isnedin case. In that case, some defendants received the entrapment instruction. One person did not, Mr. Isnedin. And that's because he did not have any interaction with the government agent until the time of the purported robbery of the drug sash house that was at issue in that case. And so he was not entitled to the entrapment defense because he was initiated, he was brought in or recruited is a term that I think could count for initiation, but he was brought into the criminal conduct by his fellow co-defendants. When he arrived, he still communicated with the government agent. The government agent did a number of things, and we've referenced them in our brief, but he did things like explain where we needed to go, what needed to be done. They worked on putting the tints onto the car. Even at one point, the government agent in Isnedin offered beer and water to Mr. Isnedin and his co-defendants. And that's very similar to what Mr. Woodard offered to the defendants at the Cheddar's meeting. But that wasn't all he offered them. He offered money as well, and Mr. Isnedin was also offered money. But my point here is that the facts are strikingly similar between Isnedin and this case. Which of these defendants joined before they had a meeting with or conversation with the government agent? All four of them, Your Honor. That's not what your opposing counsel says. Well, I think you're referring to Mr. Hart's argument on behalf of Mr. Tucker. And I would assert that it's not plausible, based on the facts in this case, that Mr. Tucker had never heard about the fact that this was about a drug transport when he arrived. He arrived in uniform. He arrived ready to go. When he was explained that this is cocaine and this is meth, there was no reaction to that. Like, oh my gosh, what is this all about? It was clear from the circumstantial evidence that Mr. Williams had explained to him what this was about. And, in fact, when Mr. Williams spoke with Mr. Woodard on the recorded call that was submitted to the evidence, he explained that he has someone who's in. That's Tucker. That's Tuck. And so it's not plausible to think that somehow Mr. Woodard was the one persuading Mr. Tucker to do this when he was ready to go. Was there any evidence to the contrary? I would assert that there isn't, because the circumstantial evidence shows that as soon as he— I'm not talking about what the circumstantial evidence shows. I'm asking if there was any evidence that he had not agreed and had not decided to join the conspiracy up to that point. I don't believe so. I think because we don't have the recorded calls between Mr. Williams and Mr. Tucker, because obviously Mr. Williams is not an agent, we don't know what was said. But we know from what Mr. Williams told Mr. Woodard, and we know from the way Tucker reacted to the deal when he showed up to do the transport. So it's your position that all the defendants had joined the conspiracy before the Cheddar's meeting? Yes, that's correct. Take us through the others real quick, what the evidence is that they had joined. So with Mr. Flewellen, he was recruited by Crystal Brooks, another co-defendant who did not go to trial. There's a statement between Brooks and Woodard where Brooks is explaining that she brought in Mr. Flewellen. Mr. Flewellen admitted on the stand when he testified that he was brought in by Brooks. And there's also evidence from the call between Mr. Flewellen and Mr. Woodard, where within one minute of that call starting, Mr. Flewellen is revealing information about what prison the tactical squad of which he's a part is going to hit next. And the reason he's doing that is because Ms. Brooks said, you need to tell Woodard, the CHS, that you're in, that you're ready to go. And so he immediately demonstrates, even before the first deal, that he's ready to go. And again, the circumstantial evidence from the first deal, although that one was not video recorded, it's just audio, it shows that Mr. Flewellen had no qualms about what he was doing and he was ready to go. He was already part of the conspiracy. As for, I'll do Mr. Williams last because he's probably the most complicated, I've already addressed Flewellen and Tucker. Ms. Mayweather is very similarly situated to Mr. Tucker, and I would argue a lot of the same things that I did for Tucker, which is that she arrives ready to go, she arrives in uniform, she does not react to the drugs when they're first shown to her, and when she's asked, are you sure it's okay, Mr. Woodard says, look, he actually says, Mr. Williams, step out of the car so I can talk to Ms. Mayweather by herself. Because he says, I want to make sure that you're okay with this. And she says, I'm fine, I'm good, I'm all right. And so for those three, again, all three of them are in the conspiracy when they first meet the CHS. Now with Mr. Williams, the argument that Ms. Silas is making is that the Cheddar's meeting, that he's on the fence, and that the Cheddar's meeting is what persuades him. And I would argue that that is not the case. Persuasion that reaches to the point of inducement happens, and money is not a good barometer, as you've already pointed out. What is a good barometer, and this is what the cases say, is that the way to assess improper inducement is repeated attempts to get a defendant to participate over the defendant's objections. And here that didn't happen. And so we have Mr. Williams listening, and then Mr. Williams participating. And so although it's a little closer call with Mr. Williams, it's still clear in our opinion that he's part of the conspiracy when he shows up at the Cheddar's meeting. But I should point out that Mr. Williams did nine different deals, Your Honor, nine different deals. He brought in six other defendants. So at best, as to entrapment, Mr. Williams would only be able to exclude the first deal and not the other eight because of the demonstrated predisposition from all the prior deals that preceded. That's post-disposition, not predisposition. Well, it's— If he had no predisposition, y'all overcame his reluctance. And once he was in, he went whole hog. That doesn't prove he didn't have—that doesn't prove he had predisposition. It logically doesn't fall. Well, I actually disagree, Your Honor, because isn't it then makes it clear that you have to assess entrapment as to each count. Each count. So on the second deal and the third deal— So once—so you can entrap him. Don't worry. Just keep the operation going until he does it seven times, eight times, nine times. Throw out the first one. Get the other eight. That's not the law. I have a different reading of his agenda. I think the course of conduct analysis— So your position is, on behalf of the United States government, is you can hold a gun to his head. You can threaten to harm his family. But once he makes that second criminal action, all bets are off. It doesn't matter that he was unduly persuaded to join the conspiracy. I mean, obviously, the first example would be duress and not entrapment, but— That's the ultimate pressure is duress. But at a minimum, with Mr. Williams, Your Honor, he was excluded from the conspiracy. So after the first two deals, Mr. Woodard said, Enough, man. Off. You need to slow down. There's evidence in the record about this. And Mr. Williams, after that, pushes to resume. So how can we say—let's say hypothetically, Your Honor, that he was entrapped, and he wasn't. But let's say he was entrapped on the first deal. When he's excluded from the conspiracy, when he's excluded from the criminal conduct by Woodard, and then invites himself back, pushes himself back in, how can we say that he's entrapped on those later seven deals just because of the conduct in advance of the first one? Well, if that's the undisputed evidence, if there's no evidence for the jury to find that didn't happen, that he didn't push himself back in, then that probably is a viable exception. But if there's a jury issue as to whether he pushed himself back in, and there's a jury issue about the pressure and predisposition, that doesn't explain the failure to give an entrapment instruction. Yes, Your Honor. My point is simply just that they do have to be assessed based on the facts of each deal. And my example shows why that is, because facts do change over the course. This is a year-long participation, and there were nine different deals, like I said, that Mr. Williams participated in. Do you want to get to McDonnell? Yes, Your Honor. So your argument, McDonnell, as I understand it, is that if these defendants had been the governor, applies full force, but they weren't the governor, they didn't have—they're official. They had official actions, and their official actions related to them being prison guards, right? Correct, Your Honor. I understand that, but a prison guard's official actions don't extend outside the prison, the guard perimeter, as they call it. Do they? It's correct, Your Honor, and there's record evidence about this point, that they are not allowed to make arrests outside the prison. Right. That's a matter of law, actually. Right. They're still post-certified officers at all times. They still have oaths and ethical obligations. Yeah, but certified officer doesn't mean they have the authority of the law enforcement. Correct. But the official action in this case is not refraining from arrest. And Ms. Silas, on behalf of Mr. Williams, is mischaracterizing what the official action is in this case. The official action is not with refraining from arrest. It's wearing the uniform, wearing the badge to exert influence on another government actor. Why is that an official action? Where in the list of their duties or in the law or in any department regulations does it say your official action is to wear the uniform to influence other law enforcement? The official action comes from the McDonnell case, which is that you can, without having the power yourself, so although they don't have the power to arrest, they can use their position as official law enforcement officer to exert pressure on another individual. And there are a number of cases. Where is that in the McDonnell case? The McDonnell opinion makes it clear that one of the ways that you can perform in the language is the decision or action, which is the official act, may include, this is quoting, I'm quoting from McDonnell, may include using his official position to exert pressure on another official to perform an official act. But he wasn't exerting pressure on anybody. Yes, he was. They all were. He was in the car. In the event of a traffic stop, and again, it can be about a pending matter or a matter that may by law be brought. It could be a hypothetical future matter. So that's from McDonnell. This is the language. And what he's doing, what each of the four defendants are doing is they're wearing the uniform to exert pressure on a potential other police officer who would conduct a traffic stop. So if he'd gone home and changed clothes, he wouldn't be guilty. Correct. So if a prison guard, long day, working overtime, stops by McDonald's that night, they're open late. He goes in, gets a little to eat, some coffee, still got his uniform on, that's an official act being in McDonald's? No, it's not because it's not about a pending. It's not about a question, matter, cause, suit, proceeding, or controversy. It's not about the formal exercise of government power. Maybe he was riding in a car. No, but the traffic stop and the real law enforcement officer who has to make a decision, do I do a criminal investigation or do I not? By exerting pressure on that other police officer. How does he exert pressure? By his presence and by attempting to influence another officer. How does he attempt to? His presence. If he just is present, how is that an attempt? Wearing a badge and he's wearing a law enforcement uniform. And this derives from real life in this case, Your Honor. No, it derives from your facts which you're trying to fit to the law. No, it derives from an actual incident in which Phoenicia Minor, another defendant, was driving during one of the drug transports that wasn't at the issue in the trial. And there's evidence from the trial about this. Ms. Minor was stopped. A real police officer approached the car and said, I see you're wearing blue. And that police officer did not initiate a criminal investigation. Suppose it had been in her home county and she's not wearing the uniform. And the officer comes up and says, oh, Beverly or Ann or Cheryl or whatever, how you doing? Fine. And he goes back and doesn't search the car. Is that an official act, her being in that car without a uniform on? If there's not an intent to exert pressure. She intended not to get arrested. No, no. But the analysis has to be, does the defendant intend to exert pressure on another? I don't understand how wearing a uniform exerts pressure. I've been around law enforcement first half of my career. And I never felt that one law enforcement officer felt pressured by another law enforcement officer, unless it's a direct supervisor. But the analysis is, what do the defendants intend to do? And the record evidence is clear that based on the conversations with the CHS, that that's the purpose. That doesn't mean they're exerting pressure. I disagree, Your Honor. I think it does. I think it's they're attempting to influence the behavior of another government actor. And I think there are cases, including a recent one. Any attempt to influence behavior is exerting pressure. So if you have a lawyer who comes up and tries to negotiate a deal with you, he's exerting pressure on you? I believe so, yes. Really? Yes. So you're exerting pressure on me today by arguing this case, right? Absolutely. And the same way with Mr. McDonnell. If he were to take a bribe, set up a meeting, and then do the additional step of exerting pressure over the scientist at UVA, he would have been committing an official act. But what was missing in that case was the pressure. How would he exert pressure? What would he say to exert pressure in the McDonnell case? So in the Supreme Court, they said putting together a meeting or having an event is not enough. Right. All right, so the UVA scientists come to the party at the governor's mansion. Right. And rather than just introducing the businessman for an ad hoc— I thought he actually urged somebody to go along with it. No, the aides said in that case that they did not pressure the people they assembled. So the aides— No, but they don't get to make a conclusion. I thought that he urged some people to go along with the— I don't think the facts show that, Your Honor, and that's what was missing. And that's why the government, I think, ultimately dismissed that case, because there wasn't pressure. Right. If he was bringing in the scientists and saying, you know, you better do this, I need you to do this, that's a different story. Well, the guard in the car didn't say, you better not check this car, I need you not to check this car. That's correct, because none of them ever were stopped, unlike the Phoenicia Minor example. But the intent is there, the purpose is there, and the reason for their presence is to exert pressure. But so in your scenario, if a prison guard is leaving the prison, driving home, and is in uniform and is stopped for speeding, just driving home, and the police officer makes that same statement that was made in the Minor case, that would not be a problem, because even though the guard was wearing a uniform, the guard did not intend in that circumstance to exert pressure. It just happened to occur. Correct, and also there wouldn't be the quid pro quo. There's no bribe involved. So no one is giving that to them, wearing the uniform, riding along, for the purpose to prevent traffic stops in criminal investigations. I should point out, though, Your Honor, that even if there's a disagreement, though, about whether or not this was an official, well, whether or not there was an official act, I think that there are cases that show that this was. I mean, one case I did want to point out, and this is a case that comes out of the District of New Jersey. This is Salahuddin. I became aware of this case after the briefing was concluded and shortly before oral argument. And I think that's a good example on this point, and I would, I think it's, even though it's a district court opinion, I think it's worth considering, because in that case, the defendant there, what he was doing was exerting pressure on others who were making decisions over government contracts. And although he didn't have his ability to do them himself, his attempts to influence those decisions was deemed an official act under the harmless error analysis. Is there anything in this record about when a prison guard can or should or may wear a uniform off-duty? There was a testimony from a Department of Corrections official named Ricky Myrick, and there was, I believe, discussion about the code of conduct and appropriate uses of the uniform. I think, if I recall correctly, Your Honor, they're allowed to wear the uniform to and from work, but they're not supposed to ride around town in it, and certainly they're not supposed to use it as a means to influence other police officers. So forget about what the intent was here. They weren't authorized to wear the uniform when they wore them outside the walls of the facility. I can't recall. There was testimony on this point, and it was the first witness. I just can't recall specifically, but I do believe they were allowed in limited circumstances to wear the uniform to and from work, like driving to work, but not— Obviously, they'd have to unless you're going to change in the car in the parking lot, which would be absurd. But my point is, if they weren't allowed to do this, if they weren't allowed to wear the uniform off-duty, off-hours as they did, how is that an official act? Well, it's the same point that I've been trying to stress, which is that it is the uniform. It's the official—it demonstrates their official capacity. Granted, they're not supposed to be wearing uniforms outside the prison walls, but it counts. That's saludine and other cases, too. But it seems to me that that's a use of official access or of official equipment, but it doesn't sound to me like it's an official action. But, Your Honor, Mosley—OK, so another example, a way to explain this would be Mosley. Mosley is the case out of District of Delaware, and that's assessing whether or not a prison guard who took a bribe to smuggle contraband into the prison was committing an official act. Now, certainly, smuggling contraband into the prison isn't an official act within their job duties. But how did he smuggle it in? I can't recall how the guards in that case smuggled it in, but it was smuggling. It was bringing in stuff that shouldn't have been brought into the prison. Clearly, that's not part of their job duties, but they're using their official capacity. You know, part of my question is why the government needs to extend in this case, why you have to stretch this. And I think it is a stretch. You may be right and they rule in your favor, but it's a stretch. You've got the illegal underlying act. Smuggling drugs into a prison, to take that other example, is a serious crime and can be punished seriously. But the government extends here and says, no, this is a use. It's not a use. It's an official action, even though officially he's not supposed to be doing that, and even though it's outside the prison and so forth and so on. I don't understand the motivation of the government to do that. You can get a sentence roughly equivalent to this on the major drug trafficking. Just comment. Well, you're correct that even if the Hobbs Act extortion counts are vacated and remanded, the sentence would remain the same because the sentences imposed for all four defendants were what they were on each count concurrent. Correct. Your Honor. But this is an important issue for the government, Your Honor, because the pattern instruction for the 11th Circuit is incorrect. It's not applicable as written to law enforcement officers. It's the only circuit that has this instruction. I understand that, and there is a committee on our pattern jury instructions. They send revisions every year, and some of us have to read them. Sometimes we pick up things and sometimes we don't. But the government's remedy is just to write a letter to the chair, who I think is Judge Scribd, and say this is wrong. It doesn't apply to law enforcement officers. It applies to governors, lieutenant governors, house chairs, and all that kind of stuff, government officials, but not necessarily to law enforcement government officials. That's the remedy to that. In this case, Your Honor, it was a correct decision, and that's why we're defending the district court's actions here. The pattern instruction goes much farther than any other circuit in this country in requiring things, including the phrase, must be like an agency determination, a lawsuit, or a committee hearing. That is not in brackets in this pattern instruction, and that would have been an error to include that, and it would have threatened our ability to prosecute these prison guards for public corruption cases. Not every case includes a drug distribution count that goes along with it. Yeah, I understand, but what will threaten your ability to do that is if we come out and say, no, the government's wrong here, that instruction does apply. I'm not suggesting that we do so, but that's what will threaten that. I understand the point, but I'm not sure this is your best case to make that particular point, particularly when the guards are told you don't have official authority to do this. You can wear the uniform to and from work and at work, but not elsewhere. It seems to me an official action is something you officially have the authority to do. I respectfully disagree, Your Honor. I think it's maybe not the perfect case, but it's a good case to do it because it's only one action. So in FATA and Silver and in McDonald itself, there's numerous actions involved. Here there's one discrete action about a discrete pending matter that's a formal exercise of government power to exert influence over another law enforcement officer, a public official, whether or not to engage in an investigation. And it fits perfectly for the law enforcement context. And I think fighting hard on this case and defending what the district court did is appropriate here because it was the right decision. And also the proposed instruction by the defendants was the wrong instruction. It was not appropriate. It was not tailored to the facts. And my time is coming to an end, but one point I wanted to make is that this official act argument was not this is going to the third prong of the abuse of discretion analysis for jury instructions. Was the proposed instruction by the defendants correct? No, it was not. We argue it wasn't tailored to the facts. Was it covered by other instructions? Probably not so much in this case. But was the third prong, was it vital to the defense of the defendants? And it was not. It was not vital. And that's why it's not reversible error or an abuse of discretion because in this case, all four opening arguments, the word official act doesn't appear in the opening arguments. It was vital in the sense that if it had been given, I thought you argued that you couldn't possibly convict these people. But up until the very end of the case is when even the specter of this defense arose. And the reason it arose is because the entrapment instruction was excluded. But even then, Your Honor, Mr. Flewellen didn't even argue. Mr. Flewellen's attorney, Mr. O'Brien, didn't argue official action in his closing. The other three did, but only in passing. I thought that they had preserved a sufficiency of the evidence issued. Am I wrong about that? They made the Rule 29 argument. So they preserved that. So whether the instruction was right or wrong, we've got to decide the same legal issue. But whether it's reversible, that third prong, is it vital to their defense? No. No. Well, that's not the sufficiency of the evidence issue. The sufficiency of the evidence issue is construing the evidence in light most favorable to the government. Was this a crime? Was it an official action element sufficient to prove beyond a reasonable doubt? So I'm not sure. I thought about the jury. I was looking for a way out of the issue, and I looked at the jury instruction requirements. And the fact that theirs wasn't really adequate, I thought. But that just punched you to the sufficiency, which has got the same core legal issue in it. Well, I understand the court's position. In that case, assessing the correctness of the proposed instruction is where I think the decision can be made. And I do think that's where it's important for the district judges to know that this pattern instruction, as it currently stands, needs to be tailored in the law enforcement context. And, Your Honor, as for the reasons I've already stated, I also believe that the entrapment instruction was properly excluded. Thank you. Thank you, counsel. Ms. Salas, two minutes. Yes, Judge. The instruction that we asked the court to give says that to qualify as an official act, the public official must have made a decision or taken an action on a question or matter. And I'm skipping some words, but the key. The words you skipped are part of your problem, are they not? Well, the words I skipped, let me not skip any, made a decision or taken an action, agreed to make a decision or take an action on a question, matter, cause, suit, proceeding, or controversy. I mean, a prison guard sees an inmate misbehaving. You know, that's his official duty, his or her official duty, official actions, et cetera. I'm not sure it fit into your instruction. Well, prison guards do make decisions when they see inmates misbehaving, and they do take actions. But in this case, Mr. Williams and the others, no one agreed to take any action whatsoever if a police officer were to happen to pull anyone over. And I think that's a key issue here. Just like in McDonald, the governor did not agree to take action on the Anatoblock case. He agreed to have meetings, et cetera. And it's true enough, those things could make it more likely for Anatoblock to succeed, but he didn't do enough for it to be considered an official action. And that's key, whether it's a passive thing that is done or whether it's an active thing or an action. In any event, it cannot be the case that to have no definition of an official act is better than having the definition that appears in this court's pattern charge that does say decision or action. And I did argue official action repeatedly in my closing argument. I also adopted the arguments of my brethren, and they argued official act repeatedly as well. Thank you, counsel. Mr. O'Brien. Your Honor, I think the significant point on behalf of Mr. Fulwellen is that he was not brought into this activity by Ms. Brooks. He was told by Ms. Brooks about Mr. Woodard's existence, and he refrained from calling Mr. Woodard on two occasions. And after that, Mr. Woodard called him directly, which is totally inconsistent with the rationale and is not. He had direct contact with Mr. Woodard, and Mr. Woodard offered him an opportunity to save his job. You know, U.S. v. Brown, and all the cases that deal with this, this is a site. Entrapment is generally a jury question. In Sistrunk, the burden on inducement is light because a defendant is generally entitled to put a recognized defense to the jury where sufficient evidence exists. And after that, after the defendant meets this burden to show, quote, some evidence that the government induced the defendant to commit the crime, the question of entrapment becomes a factual one for the jury to decide. That's all we're asking here. We're not asking for an acquittal. We're simply asking for an opportunity to let the jury decide this. And it's obvious that they were concerned with it from the note the jury sent, that they were very concerned with the conduct of the government. And the judge shut them down immediately and said, you cannot consider the government's conduct. This is not an entrapment case. Thank you, counsel. Mr. Smith. Please, the court. This case for Chelsea Mayweather, the derivative of entrapment is different from Ms. Nodden as well. This was a situation where there was a government paid guard that asked her to contact the government agent. When she goes to the agent, she was shown a large amount of money, in her words, more money than she had ever seen, to drive some drugs from one area to the other for 20 minutes. You know, this operation started as an attempt to stop contraband from entering the prison, and it ended up with guards being paid by the government to bring other guards in to be paid by an agent to carry drugs up a highway. It's a situation where they were offered a ton of money. I think at the end of the day, if you look at it, that this should have gone to a jury for entrapment. This is one of those cases that absolutely should have gone to the jury for entrapment. I believe the jury was having a hard time with it based on the jury questions that were asked. Thank you. Mr. Hart. Just briefly, Judge, I want to point out to the court that the government indicates that all four defendants have been involved since the Cheddar incident. And about five months of the operation had taken place before Mr. Tucker was contacted by Mr. Woodard. And I think, again, for reasons I pointed out earlier, that this was not a derivative entrapment situation. Unlike Izzardine, as well as MERS, Mr. Woodard had contacted Mr. Tucker on several occasions, whereas the defendants in those cases had not had any contact with a government agent until the actual transaction that took place that day. Thank you. Thank you, counsel. All right. Next case up is U.S. Commodity Futures v. Escobio. Interesting case. Mr. Peter Winslow-Homer.